Deno G. Himonas (05483)
W. Bradford Barber (18601)
**WILSON SONSINI GOODRICH & ROSATI**
15 West South Temple
Gateway Tower West, Suite 1700
Salt Lake City, Utah 84101
Telephone: (801) 401-8520
dhimonas@wsgr.com
bbarber@wsgr.com

*Attorneys for Utah Vapor Business Association, Inc.*

Trinity Jordan (15875)
Jordan E. Westgate (16098)
**DENTONS DURHAM JONES PINEGAR, P.C.**
111 South Main Street, Suite 2400
Salt Lake City, Utah 84111
Telephone: (801) 415-3000
trinity.jordan@dentons.com
jordan.westgate@dentons.com

Phillip W. Dyer (4315)
Benjamin R. Dyer (13691)
**DYER LAW GROUP PLLC**
261 East 300 South, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 363-5000
phil@dyerlawgroup.com
ben@dyerlawgroup.com

Walter A. Romney (07975)
Katherine E. Pepin (16925)
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Telephone: (801) 322-3516
war@clydesnow.com
kep@clydesnow.com

*Attorneys for Plaintiffs Utah Vapor Business Association, Inc. and The Smoke House, LLC*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH VAPOR BUSINESS ASSOCIATION, INC., a Utah nonprofit corporation, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF UTAH, *et al.*,<br><br>Defendants. | **MOTION FOR INJUNCTION PENDING APPEAL**<br><br>Case No. 2-24-CV-00950-DBB-JCB<br><br>Judge David B. Barlow<br>Magistrate Judge Jared C. Bennett |

## TABLE OF CONTENTS

RELIEF REQUESTED AND SUPPORTING GROUNDS ....................................................1

STATEMENT OF MATERIAL FACTS ...........................................................................2

ARGUMENT ..............................................................................................................7

    I.       Legal Standard ...........................................................................................7

    II.      This Court Should Grant An Injunction Pending Plaintiffs' Appeal ..............8

          A.      Plaintiffs Are Likely To Succeed On Their Appeal ................................8

                1.      Plaintiffs Established They Are Substantially Likely To Succeed On The Merits of The Preemption Claims ..................8

                2.      The Inspection Program Is Not Severable From The Act........16

          B.      Without An Injunction, Plaintiffs Will Continue To Suffer Irreparable Harm ...........................................................................19

          C.      Balance of Harm & Public Interest .....................................................21

    CONCLUSION ......................................................................................................23

## **TABLE OF AUTHORITIES**

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ...............................................15

*Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ....................................21

*Chem-Trol, Inc. v. Christensen*, No. 09- 2024-EFM, 2009 WL 331625, at *5
(D. Kan. Feb. 10, 2009) .................................................................................................................20

*ClearOne Commc'ns, Inc. v. Chiang*, 608 F.Supp. 22d 1270 (D. Utah 2009) ............................19

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ......................................................13

*Deseret Trust Co. v. Unique Investments Corp.*, 2018 WL 8110959, at * 3
(D. Utah July 3, 2018) ...................................................................................................................19

*Doe v. Heil*, 533 F. App'x 831 (10th Cir. 2013) ..........................................................................18

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) ......19

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. at 255 ...................................13

*Evans v. Utah*, 21 F. Supp. 3d 1192 (D. Utah 2014) .....................................................................7

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ..............................................14

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792
(10th Cir. 2019) ............................................................................................................................21

*Fucci v. Bowser*, No. 2:20-CV-00004, 2023 WL 6391506, at *20 (D. Utah Oct. 2, 2023) .........18

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) .................21

*Gallivan v. Walker*, 2002 UT 89, ¶ 88, 54 P.3d 1069 ...................................................................17

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ...................................................................12

*Homans v. City of Albuquerque*, 264 F.3d 1240 (10th Cir. 2001) .................................................7

*Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, 2025 WL
1276006 (S.D. Iowa May 2, 2025) .........................................................................................6, 15, 16

*Leavitt v. Jane L.*, 518 U.S. 137 (1996) .......................................................................................16

*Mark O. v. Colvin*, 2025 WL 392735, at *3 (D. Utah Jan. 8, 2025) .............................................18

*McClendon v. City of Albuquerque*, 100 F.3d 863 (10th Cir. 1996) ...........................................7

*Menthol in Cigarettes*, 78 Fed. Reg. 44 (July 24, 2013) ...........................................................14

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ..............................................................10, 12

*Neways, Inc. v. Mower*, 543 F.Supp. 2d 1277 (D. Utah 2009) ...................................................20

*Nken v. Holder*, 556 U.S. 418 (2009) ...............................................................................7, 8, 21

*Oil, Chemical & Atomic Workers Int'l v. Amoco Oil*, 885 F.2d 697 (10th Cir. 1989) .................8

*Otero Sav. & Loan Ass'n v. Fed. Reserve Bank*, 665 F.2d 275 (10th Cir. 1981) ........................20

*Regulation of Flavors in Tobacco Products*, 83 Fed. Reg. 12,294 (Mar. 21, 2018) ....................14

*Resolution Trust Corp. v. Cruce*, 872 F.2d 1195 (10th Cir. 1992) .............................................21

*Russello v. United States*, 464 U.S. 16 (1983) .........................................................................11

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir. 1986) ...............................................................................................................20

*United States v. Close*, 202 F. App'x 950 (9th Cir. 2006) ..........................................................19

*Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 17, 449 P.3d 31 ........................................16

## Rules & Statutes

Fed. R. App. P. 8 ...................................................................................................................1

Fed. R. Civ. P. Rule 62(d) ....................................................................................................7

DUCivR 7-1(b)(2) ..........................................................................................................20, 19

21 U.S.C. § 337(a) .......................................................................................................14, 15, 16

## Other Authorities

337(a) of the Federal Food, Drug, and Cosmetic Act (the "FDCA") ...........................................14

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.2 (3d ed.) ................................................21

Pursuant to Fed. R. Civ. P. 62(d) and Fed. R. App. P. 8, Plaintiffs Utah Vapor Business Association, Inc., and The Smoke House, LLC ("Plaintiffs"), through counsel, hereby move for an injunction pending appeal. Plaintiffs seek to enjoin enforcement of Utah's Electronic Cigarette Amendments (the "Act"), including the ban on the sale of flavored e-cigarettes (the "Flavor Ban").

## <u>RELIEF REQUESTED AND SUPPORTING GROUNDS</u>

In Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"),[1] Plaintiffs sought to enjoin enforcement of the Act while the Parties litigated its constitutionality. This Court granted, in part, and denied, in part, the Motion and entered orders that declined to enjoin enforcement of the Flavor Ban but enjoined enforcement of the warrantless inspection program (the "Inspection Program").

Plaintiffs are now appealing the Court's (1) Order Granting in Part Motion for Temporary Restraining Order and Preliminary Injunction[2]; (2) Order Granting Preliminary Injunction[3] (the "Inspection Program Order"); and (3) Docket Text Order (Dissolving Temporary Restraining Order)[4] (collectively the "Orders").[5]  Plaintiffs will argue on appeal this Court erred when it: (1) declined to enjoin the Flavor Ban because it held that Plaintiffs failed their "burden to establish that they are substantially likely to succeed on the merits of their preemption claims, either express or implied"[6] and ultimately dissolved the Temporary Restraining Order [Dkt. No. 57];

---

[1] ECF No. 12.
[2] ECF No. 55, entered on March 24, 2025.
[3] ECF No. 56, entered on March 24, 2025.
[4] ECF No. 57, entered on March 24, 2025.
[5] The Court in rescinding the Temporary Restraining Order [ECF No. 57], fully resolved Plaintiff's Motion [ECF No. 12], which also included the Court's prior Order Denying in Part the Motion for Temporary Restraining Order and Preliminary Injunction [ECF. No. 44] (the "Flavor Ban Order").
[6] *See* Flavor Ban Order, ECF No. 44, at p. 22.

and (2) declined to enjoin the Act in its entirety, even though it enjoined the Inspection Program, because it held that the Inspection Program was severable.[7]

Plaintiffs now seek to enjoin enforcement of the Act during the pendency of Plaintiffs' interlocutory appeal. Without such relief, retail tobacco specialty businesses ("RTSBs") will face significant, imminent, and irreparable harm. Since March 24, 2025, at least 6 RTSBs have gone out of business, and more fear they will be forced to follow suit because they have suffered a significant decrease in sales. Additionally, the Flavor Ban has only prevented the ***legal*** sale of flavored e-cigarette products. Therefore, no harm will result to the State if the Flavor Ban is not enforced during the pendency of the appeal.

## STATEMENT OF MATERIAL FACTS

Plaintiffs hereby incorporate by reference their Statement of Facts from the Motion as if fully restated herein. *See* DUCivR 7-1(a)(8). Plaintiffs also state the following additional facts:

1. In the Motion, Plaintiffs sought a preliminary injunction that enjoined enforcement of the Act including, but not limited to, the Flavor Ban and Inspection Program.

2. After briefing and oral argument, this Court granted, in part, and denied, in part, the Motion. This Court held, in relevant part, that:

    a. It would not enjoin enforcement of the Flavor Ban because Plaintiffs failed their "burden to establish that they are substantially likely to succeed on the merits of their preemption claims, either express or implied"[8];

---

[7] *See* Inspection Program Order, ECF No. 55, at pp. 16–18.
[8] *See* Flavor Ban Order, ECF No. 44, at p. 22.

b.      It would not enjoin enforcement of the Act in its entirety because it held that the Inspection Program was severable[9]; and

c.      That the Temporary Restraining Order, which prevented the enforcement of the Flavor Ban, was rescinded.[10]

3.      On March 24, 2025, this Court entered a preliminary injunction that enjoined enforcement of only the Inspection Program, but dissolved the Parties' Stipulated Temporary Restraining Order and lifted its enjoinment of the enforcement of the Flavor Ban.

4.      As a result, as of March 24, 2025, it became illegal to sell almost all flavored e-cigarette products in the State of Utah.

5.      In just the 7 weeks since the Flavor Ban has been in effect, at least 6 RTSBs have been forced out of business because they were prohibited from selling products that constituted the bulk of their revenue, even though such products are not federally banned. *See* Ex. A ¶ 5.

6.      Many more RTSBs fear they will be imminently forced out of business if the Flavor Ban is not enjoined and they are unable to sell flavored e-cigarette products. *See* Ex. A ¶ 7; Ex. B ¶ 14; Ex. C ¶ 13; Ex. D ¶ 13; Ex. E ¶ 14; Ex. F ¶ 12.

7.      For example, since March 24, 2025, Vapor Craziness, an RTSB operating in Salt Lake County, Utah, has experienced an 89.2% decrease in sales. *See* Ex. B ¶ 10.

8.      As a result, Vapor Craziness has been forced to lay off all eight (8) of its employees. *Id*. ¶¶ 4, 12.

---

[9] *See* Inspection Program Order, ECF No. 55, at pp. 16–18.
[10] *See* Docket Text Order (Dissolving Temporary Restraining Order), ECF No. 57.

9. Based on the significant decrease in sales, the owner of Vapor Craziness believes it will be forced to close its business within thirty (30) days unless enforcement of the Flavor Ban is enjoined. *Id.* ¶ 14.

10. Tobacco Joes is an RTSB operating in Weber County, Utah. *See* Ex. G ¶ 5.

11. Since March 24, 2025, when the Flavor Ban went into effect, Tobacco Joes has experienced a 53.18% decrease in sales. *Id.* ¶ 9.

12. Starry Night Emporium is an RTSB operating in Utah County, Utah, that has nine employees. *See* Ex. H ¶ 5.

13. Since March 24, 2025, when the Flavor Ban went into effect, Starry Night Emporium has experienced a 61.98% decrease in sales. *Id.* ¶ 10.

14. Riverwalk Vapors is an RTSB operating in Cache County and Weber County, Utah. *See* Ex. C ¶ 5; Ex. D ¶ 5.

15. Since March 24, 2025, when the Flavor Ban went into effect, Riverwalk Vapors has experienced an 87.43% decrease in sales at its Cache County location and an 84.4% decrease in sales at its Weber County location. *See* Ex. C ¶ 10; Ex. D ¶ 10.

16. As a result, Riverwalk Vapors is now unable to meet its fixed monthly expenses. *See* Ex. C ¶ 11; Ex. D ¶ 11.

17. Based on the significant decrease in sales, the owner of Riverwalk Vapors believes it will be forced to close both of its locations within thirty (30) days unless enforcement of the flavor ban is enjoined. *See* Ex. C ¶ 13; Ex. D ¶ 13.

18. Empire SLC 2 is an RTSB operating in Salt Lake County, Utah. *See* Ex. E ¶ 5.

19.    Since March 24, 2025, when the Flavor Ban went into effect, Empire SLC 2 has experienced a 100% decrease in sales. *Id.* ¶ 10.

20.    As a result, Empire SLC 2 laid off all six of its employees. *Id.* ¶¶ 4, 12.

21.    Based on the significant decrease in sales, the owner of Empire SLC 2 believes it will be forced to close its business within thirty (30) days unless enforcement of the Flavor Ban is enjoined. *Id.* ¶ 14.

22.    Peak Vapor is an RTSB operating in Salt Lake County, Utah. *See* Ex. F ¶ 5.

23.    Since March 24, 2025, when the Flavor Ban went into effect, Peak Vapor has experienced a 75.45% decrease in sales. *Id.* ¶ 9.

24.    Based on the significant decrease in sales, the owner of Peak Vapor believes it will be forced to close its business within (30) days unless enforcement of the Flavor Ban is enjoined. *Id.* ¶ 12.

25.    Peak Vapor 2 is an RTSB operating in Salt Lake County, Utah. *See* Ex. I ¶ 5.

26.    Since March 24, 2025, when the Flavor Ban went into effect, Peak Vapor 2 has experienced a 96.93% decrease in sales. *Id.* ¶ 9.

27.    Based on the significant decrease in sales, the owner of Peak Vapor 2 believes it will be forced to close its business within (30) days unless enforcement of the Flavor Ban is enjoined. *Id.* ¶ 12.

28.    The aforementioned RTSBs are merely representative and far from an exhaustive list of all RTSBs that have suffered harm because of the Flavor Ban. See Ex. A ¶¶ 6–7.

29.    Since the Flavor Ban has gone into effect, most health departments have not enforced the Flavor Ban. *See* Ex. K ¶¶ 6–8; Ex. J ¶ 12.

30.    For example, since March 24, 2025, the Davis County Health Department has repeatedly told RTSBs that they would not be immediately enforcing the Flavor Ban. *See* Ex. J ¶¶ 5–11.

31.    In an email dated April 29, 2025, more than a month after the Flavor Ban went into effect, a representative from the Davis County Health Department stated: "I know that Bear River Health Department is the only jurisdiction in the state that has begun enforcement." *See* Ex. J ¶ 11.

32.    As a result, local health departments are indiscriminately enforcing the Flavor Ban, meaning some RTSBs are still able to sell flavored e-cigarette products, while others are not. *See* Ex. K ¶¶ 11–16.

33.    Since the Flavor Ban has gone into effect, the black market for flavored e-cigarette products has increased. For example, several individuals who do not have RTSB licenses have advertised contraband flavored e-cigarette products for sale online, such as on Facebook exchange groups. *See* Ex. B ¶ 13; Ex. G ¶ 10; Ex. E ¶ 13; Ex. F ¶ 11.

34.    On May 2, 2025, after the Orders were issued by this Court, the United States District Court in the Southern District of Iowa held that House File 2677, an Iowa statute that—materially similar to the Act—established and enforced a registry of e-cigarette products, was impliedly preempted by the FDCA because the regulatory approach "impermissibly intrudes upon federal enforcement authority and contravenes congressional intent to centralize FDCA enforcement in the federal government." *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, 2025 WL 1276006 (S.D. Iowa May 2, 2025).

35.     Based on this implied preemption argument, the court enjoined enforcement of House File 2677. *See id*.

## ARGUMENT

### I.     LEGAL STANDARD

Under Fed. R. Civ. P. Rule 62(d), "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." When considering an injunction pending appeal, the court considers: "(1) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay or injunction is granted; and (d) any risk of harm to the public interest." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1432 (10th Cir. 2001) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 868 n.1 (10th Cir. 1996). "There is substantial overlap between these and the factors governing preliminary injunctions . . . not because the two are one and the same, but because similar concerns arise whenever a court may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34. The purpose of the injunction is to preserve the status quo pending appeal. *Evans v. Utah*, 21 F. Supp. 3d 1192, 1212 (D. Utah 2014).

## II.    THIS COURT SHOULD GRANT AN INJUNCTION PENDING PLAINTIFFS' APPEAL

### A.    Plaintiffs Are Likely to Succeed on Their Appeal

The Tenth Circuit will review a district court's grant or denial of a preliminary injunction for abuse of discretion. *See Oil, Chemical & Atomic Workers Int'l v. Amoco Oil*, 885 F.2d 697, 703 (10th Cir. 1989). Additionally, it will "consider whether the court below relied on clearly erroneous fact findings, or made any clear errors of law." *Id*. The applicant must demonstrate a "strong showing that he is likely to succeed on the merits . . . ." *Nken,* 556 U.S. at 434.

### 1.    Plaintiffs Established They Are Substantially Likely to Succeed on the Merits of the Preemption Claims

Plaintiffs are likely to succeed on appeal in challenging this Court's partial denial of the Motion, specifically the decision to not enjoin the Flavor Ban based on the Court's conclusion that Plaintiffs had not met their burden of demonstrating a likelihood of success on the merits of their express or implied preemption claims.

### a.    The Flavor Ban Regulates a Tobacco Product Standard and is Expressly Preempted by the TCA

Relevant to the preemption argument, the Court found that the Flavor Ban was not a "tobacco product standard." This is incorrect. The Tobacco Control Act contains an express preemption provision:

> No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards . . . .

21 U.S.C. § 387p(a)(2)(A). "[T]obacco product standards" include "provisions respecting the . . . additives [and] properties of the tobacco product." *Id*. § 387g(a)(4)(B)(i). "Additives" include

"substances intended for use as a flavoring." *Id*. § 387(1). Read together, those definitions support the conclusion that a "tobacco product standard" includes any provision respecting "substances intended for use as a tobacco-product flavoring." *Id*.; *see also id*. § 387g(a)(1)(A). By banning tastes and smells in tobacco products via the Flavor Ban, Utah has regulated the properties of the products and thus created a tobacco product standard. *See* Utah Code § 76-10-113(2); *id*. § 76-10-101(7).

In sum, regulations of tobacco flavors are tobacco product standards because they pertain to either "additives" or "properties" of those products. On that basis, the Flavor Ban qualifies as a tobacco product standard because the ban regulates the smell and taste of flavored e-cigarette products. The Flavor Ban states: "[B]eginning on January 1, 2025, it is unlawful for a person to give, distribute, sell, offer for sale, or furnish to any person a flavored electronic cigarette product." Utah Code § 76-10-113(2). "Flavored electronic cigarette product" means "an electronic cigarette product that is labeled as, or has a taste or smell of any fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, spice, or mint." *Id*. § 76-10-101(7)(b). The only exempt flavors are "tobacco or menthol." *Id*. § 76-10-101(7)(c).

By banning tastes and smells of e-cigarette products, Utah has regulated the additives and properties of such products and has therefore created a "tobacco product standard." Utah's tobacco product standard, if enforced, would be "different from" and "in addition to" the Tobacco Control Act's standards because the Flavor Ban prohibits the sale of any flavored e-cigarette product. The tobacco product standards annunciated in the Tobacco Control Act do not ban the sale of flavored e-cigarettes. *See* 21 U.S.C. § 387g. Rather, Congress has prohibited only the sale of flavored cigarettes, and it has left regulation of flavored e-cigarettes to the FDA. *See*

*id*. § 387g(a)(1)(A). Because Utah is attempting to enforce a more expansive prohibition, the Legislature has enacted a tobacco product standard that is expressly preempted by federal law.

In the Flavor Ban Order, the Court found that "[n]early all of the context surrounding 'tobacco product standards' involves manufacturing and other non-sales activities . . ." and do not evoke retail sales. *See* Flavor Ban Order, ECF No. 44, pp. 10–11 ("The Flavor Sales Ban does not attempt to tell a manufacturer how to make their products or set any presale requirements for tobacco products. Rather, it entirely bans the sale of flavored electronic cigarette products regardless of how the products were created or any other standard."). However, this analysis ignores the reality and actual impact of the Flavor Ban. While the Flavor Ban does not directly tell manufacturers how they can or cannot manufacture products, if retailers in Utah are prohibited from selling certain products, the manufacturers will have no market in which to sell their products. Thus, like the "sales ban" in National Meat, the Flavor Ban "functions as a command to [electronic cigarette manufacturers] to structure their operations in the exact way" that Utah wants and is precluded by the Tobacco Control Act. *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012). The Flavor Ban is, in effect, a regulation on manufacturers by framing the ban on certain flavored electronic cigarette products as a sales ban, improperly side stepping the Preemption Clause.

### b.    The Tobacco Control Act's Savings Clause does not save the Flavor Ban.

Second, Plaintiffs are likely to succeed on their appeal that the Savings Clause does not save the Flavor Ban. The Tobacco Control Act's Saving Clause exempts from preemption any state and local "requirements relating to the sale, distribution, possession, . . . exposure to, access

to, the advertising and promotion of, or use of, tobacco products by individuals of any age." 21 U.S.C. § 387p(a)(2)(B). This clause does not save the Flavor Ban for two reasons.

First, the Saving Clause does not encompass state laws and local ordinances that wholly prohibit a product's sale and distribution based on its failure to comply with tobacco product standards. Instead, the Saving Clause protects more limited laws that regulate the time, place, and manner of the product's sale or distribution.

Under its plain language, the Saving Clause applies only to "requirements relating to the sale [and] distribution" of "tobacco products." 21 U.S.C. § 387p(a)(2)(B). Sales "requirements" do not include outright prohibitions. Indeed, the very notion of a sales requirement presumes that the product can be sold under some circumstances. Moreover, the Savings Clause does not mention authority to impose tobacco product standards, unlike the Preservation Clause, which expressly reserves tobacco product standards to the FDA. *See* 21 U.S.C. § 387p(a)(1)–(2). Congress deliberately omitted the term "prohibit" in the Preservation Clause but included it in the Savings Clause, demonstrating that Congress did not intend for the Saving Clause to be construed as permitting states and localities to enact sales prohibitions. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Thus, the Saving Clause does not preserve state and local governments' ability to categorically ban the sale of tobacco products that fail to comply with a state or local "tobacco product standard."

Second, interpreting the Saving Clause to apply to laws that prohibit the sale and distribution of tobacco products altogether violates United States Supreme Court precedent. The

Supreme Court has "repeatedly decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) (alteration in original) (citation and internal quotation marks omitted). If the Saving Clause were read this broadly, the Preemption Clause would be eviscerated. States and localities could always subvert the Preemption Clause by characterizing a "tobacco product standard" as a ban on the sale or distribution of tobacco products that failed to comply with the substance of that standard.

Congress enacted the Tobacco Control Act to avoid a "patchwork" of state product standards. H.R. Rep. No. 111-58, pt. 1, at 4 (2009). Indeed, the Supreme Court has found similar categorial bans to be preempted where they conflict with federal product regulation. *See Nat'l Meat Ass'n*, 565 U.S. at 464. In *National Meat*, the Court addressed the scope of the preemption clause contained in the Federal Meat Inspection Act, which regulates slaughterhouses. *Id*. at 458. Like the Tobacco Control Act, the Meat Inspection Act has an express preemption clause prohibiting states from promulgating standards that are "in addition to, or different than those made under this [Act]," but allowing states to "mak[e] requirement[s] or tak[e] other action, consistent with this [Act]." *Id*. at 458 & n.3 (quoting 21 U.S.C. § 678). The Court held that a state statute was preempted by the Meat Inspection Act. *Id*. at 463. In a unanimous decision, Justice Kagan explained that "the sales ban . . . functions as a command to slaughterhouses to structure their operations in the exact way" that California wanted, and that was precluded by the Act. *Id*. at 464. The Court continued, "[I]f the sales ban were to avoid [the Act's] preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban

on the sale of meat produced in whatever way the State disapproved." *Id*. "That would make a mockery of the [Act's] preemption provision." *Id*.

The same is true here. "If [the Flavor Ban] were to avoid the [Tobacco Control Act's] preemption clause, then any State could impose any regulation on [tobacco product ingredients] just by framing it as a ban on the sale of [tobacco products] produced in whatever way the State disapproved." *See id*. And as the Supreme Court has observed, "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. at 255. The Tobacco Control Act's Saving Clause does not permit Utah to enact an outright Flavor Ban. This Court should not allow the State of Utah to upset Congress' design.

<b>c.    The Tobacco Control Act impliedly preempts the Flavor Ban.</b>

In addition to being expressly preempted, the Flavor Ban is impliedly preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in at least two ways. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation omitted).

First, Congress adopted the Tobacco Control Act "to authorize the [FDA] to set national standards controlling the manufacture of tobacco products and the . . . amount of ingredients used in such products." Tobacco Control Act § 3(3), 123 Stat. 1782 (codified at 21 U.S.C. § 387 note). As explained above, however, allowing state and local governments to ban the sale of tobacco products solely because they contain ingredients that reveal a characterizing flavor would undermine that purpose.

Second, the Flavor Ban would undermine Congress' and FDA's judgment that certain flavored tobacco products should remain on the market. One purpose of the Tobacco Control Act is "to continue to permit the sale of tobacco products to adults in conjunction with measures to ensure that they are not sold or accessible to underage purchasers." Tobacco Control Act § 3(7), 123 Stat. 1782 (codified at 21 U.S.C. § 387 note); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 139 (2000) ("[T]he collective premise of the [federal tobacco] statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States[.]"). The FDA has repeatedly exercised its regulatory discretion to determine whether and which flavored products, including menthol and e-cigarettes, should be restricted. *See Menthol in Cigarettes*, 78 Fed. Reg. 44,484 (July 24, 2013); *Regulation of Flavors in Tobacco Products*, 83 Fed. Reg. 12,294 (Mar. 21, 2018). Utah's unilateral prohibition in the Flavor Ban usurps this authority and imposes a conflicting judgment on product availability. If allowed to stand, the Flavor Ban would create a substantial obstacle to FDA's charge to set national standards for the manufacturing or ingredients included in tobacco products. Accordingly, the Flavor Ban is impliedly banned by the Tobacco Control Act.

### d.    The Act is Also Impliedly Preempted by the Federal Food, Drug, and Cosmetic Act

Plaintiffs are also likely to succeed on their appeal because the Act is impliedly preempted by section 337(a) of the Federal Food, Drug, and Cosmetic Act (the "FDCA"). Section 337(a) provides that enforcement proceedings under the FDCA "shall be by and in the name of the United States." *See* 21 U.S.C. § 337(a). The Supreme Court has recognized this language as "clear evidence that Congress intended" the FDCA to be "enforced exclusively by

the Federal Government." *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 352 (2001).

The Act impermissibly seeks to enforce federal premarket authorization requirements in contravention of Section 337(a)'s reservation of enforcement authority to the federal government. The Act establishes a "registry" of electronic cigarette products and imposes comprehensive requirements on RTSBs who sell electronic cigarette products in Utah. See Utah Code Ann. § 59-14-810. Under the Act, manufacturers must certify that they agree to comply with the Act and that the product has received premarket authorization by the FDA. *Id*. at § 810(1)(a). Additionally, the Act creates a comprehensive enforcement regime. The Act makes it unlawful for any person to sell vapor products in Utah that are not listed on this registry, and violations trigger escalating civil penalties and can result in suspension of the RTSB's permit. *Id*. at § 810(8). In effect, the Act allows Utah to bring enforcement actions in its own name against RTSBs based on compliance with the Tobacco Control act's PMTA process—a federal requirement that Congress entrusted exclusively to FDA enforcement.

The U.S. District Court for the Southern District of Iowa recently considered a similar challenge to Iowa's state law HF 2677, which regulated electronic cigarette and vapor products, and allowed the Iowa Department of Revenue to take enforcement actions—including imposing monetary penalties—against manufacturers and sellers of certain electronic cigarette and vapor products that have not received market authorization from the FDA. *See Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, Case No. 4-24-cv-00488-SMR-HCA, 2025 WL 1276006 (S.D. Iowa May 2, 2025). HF2677 also contemplated the creation of a registry of permissible electronic cigarette and vapor products. *Id*. at * 1.  The Court found that

HF 2677 was impliedly preempted by Section 337(a) of the FDCA because it "extend[ed] beyond a mere sales regulation by creating an extensive state-level regulatory scheme that directly incorporates federal premarket authorization status as a condition of lawful sales in Iowa." *Id*. at *11. The Court recognized that, "[b]y expressly incorporating the PMTA process into the statutory framework and using it as the foundation for determining which products may be lawfully sold in Iowa, House File 2677 effectively transfers the FDA's enforcement discretion to the state." *Id*. at *12. For these same reasons, the Act is similarly impliedly preempted by Section 337(a).[11]

2.    The Inspection Program Is Not Severable from the Act

Plaintiffs are likely to succeed on their appeal as to whether this Court erred when it held that the Inspection Program was severable from the Act and, therefore, declined to enjoin enforcement the Act in its entirety.

To determine whether the Act can survive if the Inspection Program is severed, a court must "turn to the statute itself, and examine the remaining constitutional portion of the statute in relation to the stricken portion." *Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 17, 449 P.3d 31, 37. Additionally, the court must turn to controlling state law in deciding the severability argument. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) ("Severability is of course a matter of state law.") The Act can only withstand constitutional challenge if "the remainder of the statute is operable and still furthers the intended legislative purpose." *Id*. Under Utah law, courts "look to

---

[11] The *Iowans for Alternatives to Smoking & Tobacco, Inc.* decision was issued on May 2, 2025, after this Court issued the Orders at issue here.

legislative intent" to determine whether or not a statutory subsection is severable from the whole scheme. *Gallivan v. Walker*, 2002 UT 89, ¶ 88, 54 P.3d 1069 (citation omitted).

The Inspection Program is not severable from the Act. First, the Utah legislature has chosen not to include a severability provision in the Act, even after this lawsuit was filed and the legislature was put on notice that Plaintiffs challenged the constitutionality of certain provisions of the Act. Neither the original bill, S.B. 61, or the amended bill, S.B. 186, submitted on January 30, 2025, includes a severability provision, even when such a provision could have easily been added. This intentional omission demonstrates that the Utah legislature did not intend for the Inspection Program to be severable from the Act, and the Court should not ignore this clear act of legislative intent.

The State itself conceded the Inspection Program is necessary to enforce the Flavor Ban and support the Act. In its opposition to the Motion, the State admitted that the Inspection Program was "necessary" to enforce the Act: "Warrantless administrative searches intended to prevent the illegal sale of [e-cigarette] products are necessary to ensure enforcement of the law." *See* Opposition, ECF No. 32, at pp. 25–28. According to the State's own argument, the Act cannot further its intended legislative purpose of the Flavor Ban without the Inspection Program. *See id.*

Lastly, the State waived its arguments regarding severability because it failed to timely raise them. The Plaintiffs first raised the severability argument in the Motion filed on December 23, 2024. *See* Motion, ECF No. 12, at pp. 37–38. The State responded to Plaintiffs' severability argument in a single footnote. *See* Opposition, ECF No. 32, at pp. 26–27. However, in that same filing, the State contradicts its argument that the Inspection Program is severable and concedes the Inspection Program was "necessary" to enforce the Act. *See Opposition*, ECF No. 32, at pp. 25–

28. Moreover, the State failed to set forth any evidence that the Utah Legislature intended the Inspection Program to be severable from the Act, and, thus, the brief footnote was insufficient to carry the State's burden. *See Mark O. v. Colvin*, 2025 WL 392735, at *3 (D. Utah Jan. 8, 2025) ("A court may consider an argument waived if a claimant fails to develop it, because this failure does not allow for meaningful review. [C]ursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid waiver."). At the hearing on the Motion, Plaintiffs again addressed their severability argument in oral argument, and the State failed to respond. *See* Transcript of Hearing on Motion for Temporary Restraining Order and Preliminary Injunction, Exhibit L, at pp. 8:24–9:5, 26:19–28:6. Therefore, the State Defendants waived any additional arguments regarding severability.

After the hearing, the Court ordered the Parties to submit supplemental briefing on two discrete issues: (1) "potentially binding authority on the application of the *Burger* criteria[,]" and (2) "whether the bill in legislative committee created a "prudential mootness or related issue." *See* Docket Text Order, ECF No. 45. Despite the limited scope of the supplemental briefing ordered, the State inappropriately included a new severability argument for the first time in its Supplemental Reply Brief. *See* State's Reply Brief, ECF No. 52, at pp. 9-12.

Plaintiffs objected to the State's severability argument. *See* Notice of Objection to Improper Argument in State's Reply Brief, ECF No. 54. Plaintiffs argued that the new severability arguments were improper and that courts routinely refuse to consider arguments exceeding the scope of a supplemental briefing order. *See Doe v. Heil*, 533 F. App'x 831, 836 n.4 (10th Cir. 2013) (declining to consider a "late-blooming" argument because it "exceed[ed] the scope of [the Court's] supplemental briefing order" (citation omitted)); *Fucci v. Bowser*, No. 2:20-CV-00004,

18

2023 WL 6391506, at *20 (D. Utah Oct. 2, 2023) (rejecting supplemental filings that were "unauthorized by the rules and far exceed[ed] the scope of the limited supplemental briefing permitted by the court"); *United States v. Close*, 202 F. App'x 950, 951 (9th Cir. 2006) (same). Plaintiffs also argued that, by raising new severability arguments in the Reply Brief, the State deprived Plaintiffs of the chance to respond to the late and improperly raised arguments.

The District of Utah "ordinarily does not consider arguments raised for the first time in a reply brief or at oral argument." Additionally, "[t]he local rules expressly prohibit raising in a reply brief matters not raised in an opposition memorandum … [a]nd the natural extension of this rule necessarily precludes parties from raising at oral argument what they could not have raised in reply." *Deseret Trust Co. v. Unique Investments Corp.*, 2018 WL 8110959, at * 3 (D. Utah July 3, 2018) (quoting DUCivR 7-1(b)(2)). Indeed, this Court has recognized:

> This common practice promotes fairness and efficiency. Last-ditch arguments thrown out pell-mell at a motion hearing deprive party-opponents of any reasonable opportunity to give a thoughtful, supported response. And routinely considering such arguments would necessitate additional briefing and additional argument—all of which should have come in the first round of timely filings.

*Id*. Here, the State Defendants did not even raise these arguments at oral argument; instead, they waited until after oral argument in entirely unrelated supplemental briefing. As such, these arguments should have been summarily rejected.

### B. Without an Injunction, Plaintiffs Will Continue to Suffer Irreparable Harm

Courts in the Tenth Circuit have found that irreparable harm is present where the plaintiff establishes that it would be difficult to calculate damages from harm to goodwill, diminished competitive positions in the marketplace, or loss of employees' unique services. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004); *ClearOne*

*Commc'ns, Inc. v. Chiang*, 608 F.Supp. 22d 1270, 1279 (D. Utah 2009); *Neways, Inc. v. Mower*, 543 F.Supp. 2d 1277, 1289 (D. Utah 2009). The Tenth Circuit has also acknowledged that loss of business and goodwill constitutes irreparable harm susceptible to injunction. *See Otero Sav. & Loan Ass'n v. Fed. Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981) (reasoning that service disruption would involve consequences such as "severe confusion of processes and loss of good will and customer confidence in these institutions" (citation omitted)); *see also Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (holding that "[a] threat to trade or business viability may constitute irreparable harm"); *Chem-Trol, Inc. v. Christensen*, No. 09- 2024-EFM, 2009 WL 331625, at *5 (D. Kan. Feb. 10, 2009) ("Loss of customers, especially longterm customers in which goodwill has been developed through the years, creates irreparable harm.").

Plaintiffs' fears of irreparable harm posted by the Flavor Ban are not hyperbole or merely hypothetical. Indeed, since this Court dissolved the Stipulated Temporary Restraining Order that enjoined enforcement of the Flavor Ban only 7 weeks ago, Plaintiffs have already suffered immediate and substantial irreparable harm.

The Flavor Ban has substantially limited the number and variety of products that Plaintiffs and other RTSBs can legally sell to customers. The now-banned products made up approximately 89 percent of Plaintiffs' business—and, therefore, Plaintiffs' profits—pre-Flavor Ban. *See* Motion, ECF No. 12, Bertagnolli Aff. ¶ 9. Moreover, flavored e-cigarette products, which were only available for sale from RTSBs pre-Flavor Ban, were the primary reason why Plaintiffs' customers made the additional effort to go to an RTSB versus a nearby convenience store. *Id*. Pre-Flavor Ban, Plaintiffs predicted they would be forced to close their businesses by "early next year." *See*

Motion, ECF No. 12, at p. 52, Bertagnolli Aff. ¶ 8. Unfortunately, Plaintiffs were too conservative in their estimates; since March 24, 2025, at least 6 RTSBs have closed because of the Flavor Ban, and several more fear they will be imminently forced to shut down. *See* SOF ¶¶ 5–6, 28.

Based on the foregoing, the irreparable harm to Plaintiffs created by the Flavor Ban is more than just a threat, it is real and already causing substantial, life-threatening harm to Plaintiffs' business and goodwill.

### C.    Balance of Harm & Public Interest

Generally, "[o]nce an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken*, 556 U.S. at 435. However, "[t]hese factors merge when the Government is the opposing party." *Id*. As to the balance of harm, courts consider whether Plaintiffs' threatened injury "outweighs whatever damage the proposed injunction may cause the opposing party." *Resolution Trust Corp. v. Cruce*, 872 F.2d 1195, 1198 (10th Cir. 1992). The public interest factor then requires a finding that the injunction "would not be adverse to the public interest." *Id*.

As a matter of law, protecting constitutional freedoms is in the public interest. *See G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") The State does not have an "interest in enforcing a law that is likely constitutionally infirm." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Accordingly, when a constitutional right hangs in the balance, "even a temporary loss" usually trumps any harm to the defendant. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) (quoting Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.2 (3d ed.)).

Because Plaintiffs have shown that it is substantially likely that the Act has been preempted by federal law, it follows that both the balance of the equities and the public interest lean in Plaintiffs' favor. Moreover, the State will not face any heightened risk of harm under the proposed injunction. The State and SLCHD are already achieving the legislative goal of reducing the rates of underage sales of e-cigarettes (at least in RTSBs) and the rates at which Utah's youth use e-cigarette products. Even under the status quo—which permits the sale of flavored e-cigarette products to adults 21 years or older—the number of youths who are using these products dropped to the lowest level in a decade according to recent CDC data from September 2024. The SHARP Survey revealed a similar trend in Utah.

Additionally, there is a strong public interest in reducing the number of individuals who use traditional combustible cigarette products that are proven to cause cancer. E-cigarettes represent a significant harm reduction over combustible cigarettes for users who cannot or do not want to quit consuming nicotine. While DHHS continually downplays the harm reduction potential of e-cigarettes to the public, the studies that DHHS has previously relied upon demonstrate that e-cigarettes contain 82- 99% less harmful toxicants compared to combustible cigarettes. In Plaintiffs' experience, some of their adult customers have successfully used e-cigarette products to quit smoking. There is a risk that those customers will switch back to combustible cigarettes (and their associated increases in harm to users and others due to secondhand smoke) if e-cigarette products are only offered the same flavors as cigarettes—tobacco and menthol. Alternatively, current flavored e-cigarette users may seek products on the black market and take substantial health risks like those that gave rise to the EVALI outbreak.

Finally, the requested injunction will not prejudice the State because the Flavor Ban has not prevented the sale of flavored e-cigarette products in the State of Utah. Despite the State Defendants' repeated assertions that the Act is necessary to protect the public health, many local health departments have not enforced the Flavor Ban, even after the temporary restraining order was lifted. *See* SOF ¶¶ 29–32. On April 29, 2025, a representative of the Davis County Health Department stated that only one local health department in the state of Utah had enforced the Flavor Ban, even though it had been in effect for more than a month. *See* SOF ¶ 31. Moreover, the black market for flavored e-cigarette products has increased since the Flavor Ban went into effect, and individuals living in the State of Utah are still able to purchase flavored e-cigarette products from illegal sellers. *See* SOF ¶¶ 33. Therefore, there will be little—if any—harm caused to the State if the Flavor Ban is enjoined during the pendency of Plaintiffs' appeal.

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs respectfully request that this Court enter an injunction enjoining enforcement of the Act pending appeal.

Dated: May 20, 2025.

.                                         **WILSON SONSINI GOODRICH & ROSATI**
                                            Deno G. Himonas
                                            W. Bradford Barber
                                          *Attorneys for Utah Vapor Business Association, Inc.*

                                          **DENTONS DURHAM JONES PINEGAR**
                                            Trinity Jordan
                                            Jordan E. Westgate

                                          **DYER LAW GROUP PLLC**
                                            Benjamin R. Dyer

                                          **CLYDE SNOW & SESSIONS**

                                          */s/ Walter A. Romney*
                                          Walter A. Romney
                                          Katherine E. Pepin
                                          *Attorneys for Plaintiffs Utah Vapor Business Association, Inc. and The Smoke House, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of May, 2025, I caused the foregoing **MOTION FOR INJUNCTION PENDING APPEAL**  to be e-filed which in turn caused notification of such filing to be sent to the following counsel who are identified as e-filers with this Court.


*/s/ Geniel Mortensen*

4930-3471-3413, v. 1